IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

FILED
FEB 15 2012
Clerk, U.S. District &amp; Bankruptcy
Courts for the District of Columbia

| | |
|---|---|
| CITY OF PINSON, ALABAMA,<br>a political subdivision of the<br>State of Alabama<br>4410 Main Street<br>Pinson, Alabama 35126<br><br>                Plaintiff,<br>v.<br><br>ERIC H. HOLDER, JR.,<br>Attorney General of the United States<br>of America,<br>THOMAS E. PEREZ<br>Assistant Attorney General,<br>Civil Rights Division, United States<br>Department of Justice<br>950 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20530<br><br>                Defendants. | Case: 1:12-cv-00255<br>Assigned To : Kollar-Kotelly, Colleen<br>Assign. Date : 2/15/2012<br>Description: 3-Judge Court<br><br><br><br><br><br><br><br>Three-Judge Court Requested |

COMPLAINT

The City of Pinson alleges that:

1.  This is an action brought for declaratory relief pursuant to Section 4 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973b. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1343(a)(4), 28 U.S.C. § 2201, 42 U.S.C. § 1973b and 42 U.S.C. § 1973 l(b).

2.  Plaintiff City of Pinson (the "City") was incorporated on April 2, 2004 and is a political subdivision of the State of Alabama. The City is located in Jefferson County, Alabama and covers approximately 10.1 square miles.

3.  Defendant Eric Holder is sued in his capacity as the Attorney General of the United States. The Attorney General heads the Department of Justice, which is the department in the executive branch of the United States that enforces the Voting Rights Act of 1965 (the "Voting Rights Act") generally and Section 5 of the Voting Rights Act in particular.

4.  Defendant Thomas Perez is sued in his capacity as an Assistant Attorney General. As Assistant Attorney General, Defendant Perez heads the Civil Rights Division of the

1

Department of Justice, which is the unit within the Department of Justice charged with responsibility for most Voting Rights Act matters.

5. The City's governing body is a six-member body consisting of five elected city council members and an elected Mayor. The Mayor presides at meetings of the City Council and votes on matters voted on by the members of the City Council. The members of the City Council and the Mayor are elected at large. Terms of office for the members of the City Council and the Mayor are four years in length. All members of the City Council and the Mayor are elected at the same time. The next municipal election will be held on August 28, 2012. If a candidate for the office of Mayor or a candidate for a place on the City Council does not receive a majority of the votes cast for that position, a run-off election is held between the candidate who received the most votes and the candidate who received the second most votes.

6. The Mayor Pro Tem is the only officer of the City Council. He is elected by the members of the City Council and the Mayor.

7. There are two polling places in the City which are used for general elections, but only one of them, the Pinson United Methodist Church, located at 4507 Bud Holmes Road, is used for municipal elections

8. Other than the City, there is no other elected governmental unit that exists completely within the City within the meaning of 42 U.S.C. § 1973b(a)(1).

9. According to the 2010 federal census (the "2010 Census"), as of its effective date, the City had a total population of 7,163. Of this number 5,572 (77.8%) are white, 1,234 (17.2%) are black, and 267 (3.67%) are Hispanic. According to the 2010 Census, the voting age population of the City, is 5,415 of whom 4,376 (80.8%) are white, 819 (15.1%) are black and 148 (2.7%) are Hispanic. Like all other municipalities in Alabama, except with respect to municipal elections, the City does not maintain voting statistics. That is done by the county voting registrars.

10. The registration of voters in Jefferson County is conducted by the Voting Registrar of Jefferson County (the "Voting Registrar"). According to the Voting Registrar, as of January 31, 2012, the number of registered voters who were resident of the City was 3,973, and the racial composition of those registered voters was:

| Race | Number | Percentage |
| --- | --- | --- |
| White | 3,397 | 85.50% |
| Black | 483 | 12.16% |
| Asian | 17 | .43% |
| American Indian | 8 | .20% |
| Hispanic | 20 | .50% |
| Federal | 9 | .23% |
| Other | 39 | .98% |
|  | 3,973 | 100.00% |

Black and other minority residents have been allowed to vote in the City since its incorporation in 2004.

11.   The number of registered voters in the City increased from 3,154 on June 15, 2004 (about two months after the incorporation of the City) to 3,973 on January 31, 2012, an increase of 26.0%. During the same period the population of the City increased by 17.8%. As of January 31, 2012, 73.4% of the City's voting age population, according to the 2010 Census, was registered to vote.

12.   Voter turnout for municipal elections for the City's Mayor and the City Council in the three general elections and the two runoff elections held since the City's incorporation was as follows:

| Election | | Number of Votes |
|---|---|---|
| general election | (April 2004) | unavailable |
| general election | (August 2004) | 946 |
| runoff election | (September 2004) | 861 |
| general election | (August 2008) | 333 |
| runoff election | (October 2008) | 325 |

Two general elections were held in 2004 because the City was required to have an election after its incorporation in April, 2004, and August, 2004 was the date for the regular quadrennial election. The difference between the number of voters who voted in the 2004 general election and the number of voters who voted in the 2008 general election can be at least partially explained by the fact that in the 2004 general election there was a contested election for the office of mayor, as well as for three City Council seats, whereas in the 2008 general election there were contested elections for only two City Council seats. No member of a minority race has been a candidate for the office of Mayor or for a place on the City Council.

13.   The State of Alabama was designated as a jurisdiction subject to the provisions of the Voting Rights Act, effective November 1, 1964, on the basis of determinations made by the United States Attorney General that Alabama maintained a "test or device" as defined in Section 4(b) of the Voting Rights Act, and by the Director of the Census that fewer than fifty percent (50%) of the persons of voting age residing in the state voted in the 1964 presidential election. 42 U.S.C. 1973(b). The test or device triggering preclearance coverage under Section 5 of the Voting Rights Act was Section 181 of the Constitution of Alabama of 1901 (the "Alabama Constitution") providing for a literacy test as a prerequisite for becoming an elector. The literacy test was repealed in 1996 by Amendment No. 579 to the Alabama Constitution. As a political subdivision of the State of Alabama, the City is subject to certain remedial provisions of the Voting Rights Act, including the provisions of Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c. Under Section 5 of the Voting Rights Act, known as the "preclearance" provisions, covered jurisdictions, including the City, are required to seek and obtain preclearance from either this Court or from the Attorney General of the United States for any change affecting voting, and such preclearance must be obtained prior to implementation of the change.

14.   Since its inception in 1965, the Voting Rights Act has allowed the states and their political subdivisions which are subject to the remedial provisions of the Voting Rights Act to

exempt themselves from coverage under the Voting Rights Act's remedial provisions if they can satisfy the standards established in the Voting Rights Act. This exemption process is known as a "bailout." In 2009, the Supreme Court made clear that the bailout provision is applicable to all covered jurisdictions - not just those jurisdictions that register voters. *Northwest Austin Municipal Utility District Number One v. Holder*, 129 S.C. 2504 (2009).

    15.    In 1982 Congress made changes in the exemption standards of the Voting Rights Act. As amended in 1982, Section 4 of the Voting Rights Act provides that States and political subdivisions covered under the remedial provisions of the Voting Rights Act are entitled to a declaratory judgment in this Court granting an exemption from the Voting Rights Act's remedial provisions if, during the ten years preceding the filing of the action:

    a. no test or devise has been used within the political subdivision seeking a declaratory judgment for the purpose, or with the effect, of denying or abridging the right to vote on account of race, color or membership in a language minority group;

    b. no final judgment has been entered by any court determining that the political subdivision has denied or abridged the right to vote on account of race, color or membership in a language minority group;

    c. no consent decree, settlement or agreement has been entered into by the City resulting in any abandonment of a voting practice challenged on the grounds that a voting practice denied or abridged the right to vote on account of race, color or membership in a language minority group;

    d. no Federal examiners have been assigned to the political subdivision;

    e. the political subdivision and all governmental units within the political subdivision have complied with the preclearance provisions of Section 5 of the Voting Rights Act, 42 U.S.C. 1973c; and

    f. the Attorney General has not interposed any objection to any proposed voting change within the political subdivision, no declaratory judgment has been denied with regard to such a change by this Court under Section 5 of the Voting Rights Act and no such submission or declaratory judgment actions are pending.

    16.    As amended in 1982, Section 4 of the Voting Rights Act also requires political subdivisions seeking an exemption from the Voting Right Act's special provisions to show that, during the pendency of the declaratory judgment action seeking such exemption, the political subdivision:

    a. has eliminated any voting procedures and methods of election which inhibit or dilute equal access to the electoral process;

    b. has engaged in constructive efforts to eliminate any intimidation or harassment of persons exercising rights under the Voting Rights Act; and

    c. has engaged in other constructive efforts, such as expanded opportunity for convenient registration and voting for every person of voting age and the appointment of minority persons as election officials throughout the jurisdiction and at all stages of the election and registration process.

    17. Since its incorporation in 2004 the City has made numerous submissions to the Department of Justice seeking preclearance of annexations and other voting changes under Section 5 of the Voting Rights Act. The City has submitted all voting changes for Section 5 preclearance to the Department of Justice over the years. Because the City has sought only administrative preclearance, the District Court for the District of Columba has not denied a Section 5 declaratory judgment in any case in which the City sought preclearance.

    18. The defendant Attorney General has not interposed an objection to any of the voting changes that have been submitted by the City for preclearance under the Voting Rights Act. By not interposing an objection to these changes, the defendant Attorney General has concluded that the voting changes submitted were free of a racially discriminatory purpose or a racially discriminatory effect.

    19. Voter registration opportunities are readily and equally available to all residents of the City. The voter registration office for the residents of the City is located at the Jefferson County courthouse, in downtown Birmingham, the largest municipality in Jefferson County and a reasonably convenient location for the residents of the City. The voter registration office is open from 8:00 a.m. to 5:00 p.m. on Monday through Friday. Voter registration applications are available at the Voting Registrar's office, at public libraries throughout Jefferson County, at locations where food stamps are distributed, at the Jefferson County Health Department, at other state agencies and at special events, such as voter registration drives. The completed registration applications may be mailed to the Voting Registrar or left at the place where they are obtained, for delivery to the Voting Registrar. In addition, voter registration applications are available at the website of the Alabama Secretary of State, and when completed, are to be mailed to the Voting Registrar.

    20. While in past years most voters became registered at the Voting Registrar's office, the implementation of the National Voter Registration Act has changed the origin of registration applications so that the great majority of them are now sent in by mail or filled out and left at state agencies.

    21. No minority person has served as a poll official for a municipal election in the City. The City has no record of a minority person having asked to serve as a poll official for a municipal election. Poll officials for state and federal elections are appointed by Jefferson County's Appointing Board (the "Appointing Board"), which is composed of three members, the Judge of Probate of Jefferson County, the sheriff of Jefferson County and the Clerk of the Jefferson County Circuit Court. The City Council appoints the poll officials for municipal elections. Although not required to do so by law, the City Council has appointed as poll officials for municipal elections people who were appointed as poll officials by the Appointing Board for state and national elections because they had experience serving as poll officials. The Mayor of the City recently asked a black person to serve as a poll official in the next municipal election, which will be held in August, 2012, but she declined to do so. The Mayor will continue his efforts to have a member of a minority serve as a poll official for the 2012 municipal election.

22. Since the incorporation of the City, no person in the City has been denied the right to vote on account of race, color, or membership in a minority language group.

23. No "test or device" as defined in the Voting Rights Act (42 U.S.C. § 1973b(c)) has been used in the City as a prerequisite to voting. As stated in paragraph 10 of this Complaint, the registration of voters in Jefferson County is conducted by the Voting Registrar.

24. The City has never been the subject of any lawsuit in which it was alleged that a person or persons were denied the right to vote on account of race, color or membership in a language minority group.

25. No voting practices or procedures have been abandoned by the City or challenged on the grounds that such practices or procedures would have either the purpose or the effect of denying the right to vote on account of race, color or membership in a language minority group.

26. There is no indication that the City has engaged in violations of any provision of the Constitution or laws of the United States or any State or political subdivision with respect to discrimination in voting on account of race or color or membership in a language minority group.

27. The City has not employed any voting procedures or methods of election that inhibit or dilute equal access to the electoral process by minority voters in the City. Under the election methods employed by the City since its incorporation, black voters or other minority voters have not been denied an equal opportunity to elect candidates of their choice to the City Council or as Mayor. None of the City's election practices or procedures has been abandoned in the face of any lawsuit, challenge or potential challenge.

28. No Federal Examiners have been appointed or assigned to the City under Section 3 of the Voting Rights Act.

29. Because there have not been any known incidents in the City where any person exercising, or attempting to exercise, his or her rights protected under the Voting Rights Act has been intimidated or harassed, the City has not had occasion to take any action eliminating such activity.

30. The allegations set forth in paragraphs 13 through 29 above, if established, entitle the City to a declaratory judgment under Section 4 of the Voting Rights Act, exempting the City from the remedial provisions of the Voting Rights Act.

31. By a resolution adopted on September 3, 2009, the City Council of the City voted unanimously to proceed with the bailout.

32. Pursuant to 42 U.S.C. § 1973b(a)(4), the City has publicized the intended commencement of this action by publishing a notice of its intention to commence this action in three newspapers serving the City and by posting a notice of its intention to commence this action in each of the two United States post offices located within the City. The City published a legal Notice that it intended to commence this bailout action in *The Birmingham News* on January 20, 2012, in *The Pinson-Clay News* on January 19, 2012 and in the *Trussville Tribune* on January 19, 2012. *The Birmingham News* is a newspaper published in the City of Birmingham, which is located in Jefferson County, Alabama. *The Birmingham News* is a newspaper of

general circulation in Jefferson County, Alabama, including the City, and has a circulation of approximately 99,433 on weekdays. *The Pinson-Clay News* is a newspaper published once each week, the circulation of which is primarily in the City and in the Cities of Clay, Trussville and Center Point, all of which cities are located in the northeastern section of Jefferson County. The circulation of *The Pinson-Clay News* is approximately 5,000. The *Trussville Tribune* is a newspaper published once each week, the circulation of which is primarily in the Cities of Trussville and Clay and in the City. The circulation of the *Trussville Tribune* is approximately 3,500. In addition to the aforementioned publication and posting, the City posted notices of its intention to commence this action at the following public locations in the City: the City's City Hall, the Pinson Community Center, the Pinson United Methodist Church and the Palmerdale Homestead Community Center. As of the date of the filing of this complaint, no objections have been made to the City, or any official thereof, with respect to the City's efforts to seek a bailout from the remedial provisions of the Voting Rights Act.

WHEREFORE, plaintiff City respectfully prays that this Court:

A.  Convene a three-judge court, pursuant to 28 U.S.C. § 2284 and 42 U.S.C. § 1973b(a)(5), to hear the claims raised in this complaint;

B.  Enter a declaratory judgment that the City is entitled to a bailout from the remedial provisions of the Voting Rights Act; and

C.  Grant such other relief as may be necessary and proper as the needs of justice may require.

Counsel for Plaintiff:

/s/ Michael D. Goodstein
Michael D. Goodstein
Attorney for City of Pinson
Hunsucker Goodstein & Nelson PC
5335 Wisconsin Avenue, NW
Suite 360
Washington DC, 20015
Telephone: (202) 895-5381
Fax: (202) 895-5390
mgoodstein@hgnlaw.com
DC Bar No. 469156

*Frank C. Galloway Jr*

Frank C. Galloway, Jr., Pro Hac Vice (pending)
Attorney for City of Pinson
Hand Arendall, LLC
1200 Park Place Tower
2001 Park Place North
Birmingham, Alabama  35203
Telephone: (205) 502-0102
Fax: (205) 397-1305
fgalloway@handarendall.com