IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CITY OF PINSON,                        )
a political subdivision of             )
the State of Alabama,                  )
                                       )
        Plaintiff,                     )
                                       )
v.                                     )        Civil Action No. 1:12-cv-255
                                       )         CKK, KLH, RBW
ERIC H. HOLDER, JR.,                   )        (three-judge court)
Attorney General of the                )
United States of America,              )
                                       )
THOMAS E. PEREZ,                       )
Assistant Attorney General,            )
Civil Rights Division,                 )
                                       )
        Defendants                     )
_____    )

## CONSENT JUDGMENT AND DECREE

1.      This action was initiated on February 15, 2012, by the Plaintiff City of Pinson,

Alabama ("Pinson" or "the City"), against the Defendants Attorney General of the United States

and the Assistant Attorney General, Civil Rights Division (collectively the "Attorney General").

2.      Pinson is a governmental entity organized under the constitution and laws of the

State of Alabama.  Pinson was first incorporated as a city on April 2, 2004.  The State of

Alabama, in which Pinson is located, is a covered jurisdiction subject to the special provisions of

the Voting Rights Act, including Section 5 of the Act, 42 U.S.C. § 1973c.  Alabama is subject to

Section 5 based upon a determination by the Attorney General that Alabama maintained a "test

or device" as defined by Section 4(c) of the Act on November 1, 1964, and a determination by

the Director of the Census that less than 50 percent of voting age residents of Alabama voted in

the 1964 presidential election.  20 Fed. Reg. 9897-01 (Aug. 7, 1965).  By virtue of this coverage

1

determination, the State of Alabama and all of its political subdivisions, including the City of

Pinson, must receive preclearance under Section 5 of the Act for all changes enacted or

implemented after November 1, 1964 that affect voting.

3.     Through this action, the City seeks a declaratory judgment pursuant to Section

4(a)(1) of the Voting Rights Act, 42 U.S.C. § 1973b(a)(1), declaring it exempt from coverage

under Section 4(b) of the Act, 42 U.S.C. 1973b(b).  Exemption under Section 4(b) would in turn

exempt the City from the preclearance provisions of Section 5 of the Act, 42 U.S.C. § 1973c.

4.     This three-judge district court has been convened as provided in 42 U.S.C. §

1973b(a)(5) and 28 U.S.C. § 2284 and has jurisdiction over this matter.

5.     Section 4(a) of the Voting Rights Act provides that a political subdivision subject

to the special provisions of the Act may be exempted or "bailed out" from those provisions

through an action for a declaratory judgment before this Court if it can demonstrate fulfillment of

the specific statutory conditions in Section 4(a) for both the ten years preceding the filing of the

action, and throughout the pendency of the action.  The statutory conditions the City must satisfy

are as follows:

>    (A)  no such test or device has been used within such State or political subdivision
>    for the purpose or with the effect of denying or abridging the right to vote on
>    account of race or color or (in the case of a State or subdivision seeking a
>    declaratory judgment under the second sentence of this subsection) in
>    contravention of the guarantees of subsection (f)(2) of this section (42 U.S.C. §
>    1973b(a)(1)(A));
>
>    (B)  no final judgment of any court of the United States, other than the denial of
>    declaratory judgment under this section, has determined that denials or
>    abridgements of the right to vote on account of race or color have occurred
>    anywhere in the territory of such State or political subdivision or (in the case of a
>    State or subdivision seeking a declaratory judgment under the second sentence of
>    this subsection) that denials or abridgements of the right to vote in contravention
>    of the guarantees of subsection (f)(2) of this section have occurred anywhere in
>    the territory of such State or subdivision and no consent decree, settlement, or
>    agreement has been entered into resulting in any abandonment of a voting practice

challenged on such grounds; and no declaratory judgment under this section shall be entered during the pendency of an action commenced before the filing of an action under this section and alleging such denials or abridgements of the right to vote (42 U.S.C. § 1973b(a)(1)(B));

(C)  no Federal examiners or observers under subchapters I-A to I-C of this chapter have been assigned to such State or political subdivision (42 U.S.C. § 1973b(a)(1)(C));

(D)  such State or political subdivision and all governmental units within its territory have complied with section 1973c of this title, including compliance with the requirement that no change covered by section 1973c of this title has been enforced without preclearance under section 1973c of this title, and have repealed all changes covered by section 1973c of this title to which the Attorney General has successfully objected or as to which the United States District Court for the District of Columbia has denied a declaratory judgment (42 U.S.C. § 1973b(a)(1)(D));

(E)  the Attorney General has not interposed any objection (that has not been overturned by a final judgment of a court) and no declaratory judgment has been denied under section 1973c of this title, with respect to any submission by or on behalf of the plaintiff or any governmental unit within its territory under section 1973c of this title, and no such submissions or declaratory judgment actions are pending (42 U.S.C. § 1973b(a)(1)(E)); and

(F)  such State or political subdivision and all governmental units within its territory-- (i) have eliminated voting procedures and methods of election which inhibit or dilute equal access to the electoral process; (ii) have engaged in constructive efforts to eliminate intimidation and harassment of persons exercising rights protected under subchapters I-A to I-C of this chapter; and (iii) have engaged in other constructive efforts, such as expanded opportunity for convenient registration and voting for every person of voting age and the appointment of minority persons as election officials throughout the jurisdiction and at all stages of the election and registration process. (42 U.S.C. § 1973b(a)(1)(F)(i-iii)).

6.      Section 4(a) also provides the following additional requirements to obtain bailout:

To assist the court in determining whether to issue a declaratory judgment under this subsection, the plaintiff shall present evidence of minority participation, including evidence of the levels of minority group registration and voting, changes in such levels over time, and disparities between minority-group and non-minority-group participation. (42 U.S.C. § 1973b(a)(2));

No declaratory judgment shall issue under this subsection with respect to such State or political subdivision if such plaintiff and governmental units within its

territory have, during the period beginning ten years before the date the judgment is issued, engaged in violations of any provision of the Constitution or laws of the United States or any State or political subdivision with respect to discrimination in voting on account of race or color or (in the case of a State or subdivision seeking a declaratory judgment under the second sentence of this subsection) in contravention of the guarantees of subsection (f)(2) of this section unless the plaintiff establishes that any such violations were trivial, were promptly corrected, and were not repeated.  (42 U.S.C. § 1973b(a)(3));

The State or political subdivision bringing such action shall publicize the intended commencement and any proposed settlement of such action in the media serving such State or political subdivision and in appropriate United States post offices. (42 U.S.C. § 1973b(a)(4)).

7.     Finally, Section 4(a)(9) provides that the Attorney General can consent to entry of a declaratory judgment granting bailout "if based upon a showing of objective and compelling evidence by the plaintiff, and upon investigation, he is satisfied that the State or political subdivision has complied with the requirements of [Section 4(a)(1)] . . . ." 42 U.S.C. § 1973b(a)(9).

8.     The Attorney General has conducted a comprehensive and independent investigation to determine the City's entitlement to bailout.  In so doing, he has, among other things, interviewed members of the local minority community, interviewed Pinson and Jefferson County election officials, and reviewed documents related to the City, including available background information and demographic data, minutes of the Pinson City Council meetings, records relating to voter registration and turnout in the City and County, and records of the City's preclearance submissions.

9.     The parties agree that allowing bailout by the City is appropriate notwithstanding the fact that it was first incorporated in 2004, and began conducting its own municipal elections, less than ten years ago.  This consent is premised on an understanding that Congress intended Section 4(a) as a remedy that is to be linked to the most recent ten-year history of a particular

territorial area.  For the past ten years and through the present time, Jefferson County has administered all voter registration as well as the conduct of federal, state, and county elections in the geographic area that encompasses the City, and there is no evidence of discrimination in voting on account of race or color during this period.  The Attorney General has previously consented to bailout, and this Court has granted bailout, to another similarly situated municipality, Sandy Springs, Georgia, as well as to nine school districts in Virginia that had conducted elections for less than ten years.

10.     The Attorney General and Pinson agree that the City has fulfilled the conditions required by Section 4(a) and is entitled to the requested declaratory judgment allowing it to bail out of Section 5 coverage.  Accordingly, the City and the Attorney General have filed a Joint Motion for Entry of this Consent Judgment and Decree.

<u>AGREED FACTUAL FINDINGS</u>

11.     Pinson is located in Jefferson County, Alabama.

12.     Pursuant to a citizen petition, the incorporation election for the City of Pinson was held on March 30, 2004, by order of the Probate Court of Jefferson County.   After the election results were certified, the Probate Court ordered the incorporation of the City on April 2, 2004.

13.     There are no other governmental subdivisions within Pinson's territory for which it is responsible or which must request bailout at the same time as the City, within the meaning of Section 4(a), 42 U.S.C. § 1973b(a).  The Jefferson County Board of Education administers the public schools in Pinson.

14.     Pinson was a Census Designated Place (CDP) for the 2000 Census, even though it was not incorporated as a City until 2004.  The 2000 Census reported a population of 5,033 persons in the Pinson CDP, of whom 4,432 (88.1%) were white, 416 (8.3%) were black and 114

(2.3%) were Hispanic.   The total voting age population in 2000 of the Pinson CDP was 3,610 persons, of whom 3,282 (90.9%) were white, 210 (5.8%) were black and 72 (2.0%) were Hispanic.  Pinson has experienced significant population growth since its incorporation in 2004, in large part due to annexations.  The 2010 Census reported a population of 7,163 persons in Pinson, of whom 5,572 are white (77.8%), 1,234 (17.2%) are black and 267 (3.7%) are Hispanic.  The total voting age population in 2010 in Pinson is 5,415, of whom 4,376 are white (80.8%), 819 (15.1%) are black and 148 (2.7%) are Hispanic.

15.     Pinson is governed by a five-member city council and a mayor.  All five of the city council members are elected at-large with numbered posts.  The mayor is also elected at-large.  The mayor and the council members serve four-year terms of office.  Elections are held concurrently for all municipal positions in Pinson, so all council members and the mayor run for office in the same year.  The mayor presides over the council and may vote as a member of the council on any matter coming to a vote, and must vote in the case of a tie.  Pursuant to state law, municipal elections are non-partisan and conducted on the fourth Tuesday in August in even-numbered presidential election years.  Likewise, pursuant to state law, candidates for municipal office must receive a majority of the votes cast for that position to be elected, and if no candidate receives a majority of the vote in the election, then a runoff election is held.  The City adopted this government structure at the time of its incorporation in 2004.  The Attorney General precleared this government structure under Section 5 in 2004.

16.     All of the current city council members and the mayor in Pinson are white.  There has never been a non-white city councilmember or a non-white mayor, nor even a non-white candidate for these positions.

17.     Jefferson County administers all federal, state, and county elections in Pinson, but not municipal elections.

18.     The Jefferson County Board of Registrars is responsible for all voter registration in the County, for maintaining the County's list of registered voters, and for securing polling sites, voting equipment and election supplies for election day for County-conducted elections.  In Jefferson County, the registrar of voters is a civil service position that is filled by the County Commission.  The registrar of voters must get approval for election-related decisions from the County Commission, including all voting changes under Section 5.

19.     Voter registration in Alabama is unitary, so one application registers voters for all elections—federal, state, county, and municipal.  Voter registration is available at all county courthouses, public libraries, Department of Public Safety driver licensing offices, Department of Human Resources offices, Department of Public Health WIC offices, Medicaid offices, Department of Rehabilitation Services offices, and other government offices.  Mail-in voter registration forms are also available online at the Alabama Secretary of State's website and the U.S. Election Assistance Commission website.  Alabama state law requires an original signature to register to vote, so applicants must print out the forms, sign them, and submit them in hard copy.  Ala. Code § 17-3-52.  Voter registration opportunities are advertised with posters at the county courthouses, libraries, city halls, and senior citizen centers.  Voters can use an online application on the Secretary of State's website to check the status of their voter registration, check the status of their provisional ballot, check the status of their absentee ballot or find their polling place.  Voters can also find absentee ballot, emergency absentee ballot and UOCAVA absentee applications on the Secretary of State's website.  The registrar of voters also works with the *Birmingham News* to publish notifications of election registration deadlines.

20.     The Jefferson County Appointing Board handles poll worker hiring, training, and staffing for federal, state, and county elections in Pinson, as well as some election day logistics and the certification of election results.  The Board consists of the county probate judge, the Clerk of the Jefferson County Circuit Court, and the county sheriff.  Ala. Code § 17-1-2.  In Jefferson County, all three of these officials are elected.  The probate judge chairs the Appointing Board and serves as the chief election authority of each county.  Ala. Code § 17-1-3.  An elections supervisor also works for the probate judge.  The elections supervisor is a non-elected, quasi-civil service job.

21.     The County Appointing Board maintains a large pool of potential poll workers that is used to staff elections.  For each election, the elections supervisor makes a list of potential poll workers based on prior years' lists.  One week before the workers' official selection, the elections supervisor gives the chairs of the Democratic and Republican parties the list for their input.  This process is required by the terms of a consent decree in *Harris v. Conradi*, Civ. No 78-G-1165-S (N.D. Ala. May 8, 1985).  The elections supervisor then presents the final list to the Appointing Board for approval.  The Appointing Board votes on the list in its entirety rather than on individual poll workers, and approval requires a majority vote.  Race is generally not considered when poll workers are selected, but the elections supervisor seeks to staff precincts with large minority populations with some minority poll workers whenever possible.

22.     All poll workers must attend training organized by the Appointing Board. Jefferson County holds four large "schools" for poll workers across the County.  The elections supervisor oversees the schools.  There are also smaller schools that provide more details about specific election-related tasks, as well as sessions that focus on problems that arose in previous elections.  These sessions are not mandatory but any poll worker may attend.

23.     The elections supervisor is also responsible for the staffing of polling sites.  Under Alabama law, each site must have a chief inspector, an assistant chief inspector, and at least one election clerk.  Most sites have more than one clerk, and some sites have a clerk dedicated to provisional ballots.  There are no staffing requirements related to political parties.  Chief inspectors are selected based upon their experience level from prior elections.  The total number of workers assigned to each site varies, but each polling site usually has at least five workers.  Decisions concerning the number of workers assigned to each site are made based on turnout in previous elections.

24.     For federal, state, and county elections, there are two polling sites located within the city limits of Pinson: the Pinson United Methodist Church, and the Palmerdale United Methodist Church.  For the 2010 federal general election, seventeen poll workers were assigned to these sites.  All of the poll workers at both sites were white.

25.     Under Alabama law, Pinson is responsible for municipal elections.  Ala. Code § 11-46-20.  For municipal elections, Pinson's city clerk is the chief elections official.  Pinson does not have a board of elections.  Pinson contracts with Jefferson County for its voting equipment, but Pinson obtains its own printed election materials, including ballots, absentee ballots, and sample ballots, pursuant to a contract with a third-party vendor.

26.     For municipal elections, there is only one polling site in Pinson, at the Pinson United Methodist Church.  Pinson voters may also vote with paper absentee ballots requested from the County.  The City sets up an Automark voting machine in city hall for disabled voters.  Absentee ballots may be mailed or delivered in person to the city clerk.

27.     Pinson hires poll workers for municipal elections from the same list compiled by the County's Appointing Board.  Although the City may hire its own workers, it historically has

used the County's list.  The City Clerk selects workers from the list, giving priority to individuals with the most experience from prior elections.  The Mayor then presents the list to the City Council for approval.  In most instances there is no information available as to the race of the workers on the County's list.  The City does not have any set policy or practice aimed at hiring a diverse set of poll workers.  Because the City uses Jefferson County's list of potential poll workers, an individual seeking to become a municipal poll worker must apply through the County.  The City does not advertise for poll worker positions.  As described below, Pinson has agreed to take affirmative steps to expand the opportunity for recruitment and participation of a diverse group of poll officials in elections in Pinson.

28.     The Jefferson County Board of Registrars conducts all voter registration in Jefferson County for all elections.  Comparison of available voter registration data and census data indicates that the rate of voter registration in Jefferson County is relatively high.  In 2010, the Census reported a total voting age population in the County of 503,938, of whom 274,788 (54.5%) were white and 200,698 were black (39.8%).   As of 2011, Jefferson County had 411,735 total registered voters, of whom 236,352 (57.4%) were white and 163,881 (39.8%) were black.  This indicates that the overall rate of voter registration in Jefferson County is 81.7% of the 2010 voting age population, and the gap between rates of voter registration for black and white citizens in Jefferson County overall is relatively small:  the voter registration rate for white voting age residents is 86%, and for black voting age residents is 81.7%.

29.     Available voter registration data from the last ten years shows that registration of black voters has increased in Pinson since 2000.   In 2000, the Census reported a total voting age population for the Pinson CDP of 3,610 persons, of whom 3,282 (90.9%) were white and 210 (5.8%) were black.  By the time Pinson incorporated in 2004, the City had 3,512 registered

10

voters, of whom 3,340 (95.1%) were white and 119 (3.4%) were black.  In 2010, the Census

reported a total voting age population of 5,415 persons, of whom 4,376 (80.8%) are white and

819 (15.1%) are black.  As of 2011, Pinson had 3,994 registered voters, of whom 3,421 (85.7%)

are white and 482 (12.1%) are black.  Thus, between 2004 and 2011, the number of African-

American voters in Pinson increased fourfold (405%), from 119 voters to 482 voters.  This

increase slightly outpaced the growth in the African-American voting age population in Pinson

between 2000 and 2010, which increased by 390%.   Voter registration data for 2011 also puts

the overall registration rate in Pinson at 73.8% of 2010 voting age population, with the

registration rate for white voting age residents at 78.2% and the registration rate for black voting

age residents at 58.9%.  The voter registration rate for black voting age residents in Pinson is

lower than the voter registration rate for black voting age residents in Jefferson County overall,

and there is a larger gap between white and black voter registration rates in Pinson than in

Jefferson County as a whole.  Voter registration is conducted by Jefferson County and not by

Pinson, and the Attorney General's investigation uncovered no evidence of conduct on the part

of either Jefferson County or Pinson that has contributed to this lower level of voter registration.

In addition, as described below, Pinson has agreed to take affirmative steps to expand the

opportunity for voter registration in Pinson.

        30.     Due to the manner in which Jefferson County assigns polling sites and maintains

its records, complete turnout data for the City for federal, state, and county elections is not

available.  The available turnout data from the two Pinson polling sites for federal, state, and

county elections shows a decline in voter turnout between 2002 and 2010.  In 2002, those polling

sites had 78.0% turnout; in 2004, turnout dropped to 74.2%; in 2006, turnout declined to 61.2%;

in 2008, turnout dropped again to 52.6%; and in 2010, turnout rebounded to 59.3%.  The County does not maintain voter turnout data broken down by race.

31.     The City of Pinson has held three municipal elections since its incorporation. There was an initial election for mayor and council, and a runoff election, ordered by the Probate Court after the City's incorporation, held in May 2004.  Subsequently, in 2004, and 2008, Pinson held municipal elections in August on the regularly scheduled municipal election dates under state law, followed by runoff elections where needed.  In 2004, the regularly scheduled municipal election saw a turnout rate of 27.5%, and a subsequent run-off election had a 24.5% turnout rate.  In 2008, the regularly scheduled municipal election saw a turnout rate of 9.1%, and the run-off turnout rate was 8.9%.  The City does not maintain turnout data broken down by race.

32.     Since its creation in 2004, the City has made 12 submissions to the Attorney General under Section 5 for administrative preclearance review of 237 voting changes.  The submitted changes include a special incorporation election and other incorporation-related voting changes in 2004, special election procedures and polling place selections, new voting equipment, a deannexation, and numerous annexations of new land for the City.  The Attorney General has not interposed objections to any of these proposed changes.  The City has never sought Section 5 preclearance from this Court.  The City currently does not have any Section 5 submissions pending before the Attorney General.

33.     The Attorney General reviewed the records of Pinson in the course of considering the City's bailout request, and found a small number of previously unsubmitted changes that were not reflected in the City's previous submissions under Section 5.  Such review also determined that the failure to make such submissions was inadvertent and not the product of any discriminatory purpose.   After notice by the Attorney General, Pinson promptly submitted three

2010 annexations that had not been implemented in municipal elections, as well as a 2008 annexation of three parcels of uninhabited land that occurred before the last municipal election in 2008, and the Attorney General granted preclearance to all of these changes.  Given the circumstances, the parties agree that bailout should not be denied based on this basis.  While each of the 2008 annexations could be characterized as an unsubmitted voting change enforced prior to Section 5 preclearance, the omission was inadvertent, each such annexation was minor and unpopulated, and they have now been precleared.  This Court has granted bailout to other jurisdictions that have similarly implemented certain minor changes prior to Section 5 review. *See, e.g.*, *Augusta County v. Gonzales*, No. 05-1885 (D.D.C. Nov. 30, 2005).  The parties agree that the City is now in full compliance with the preclearance requirements of Section 5.

34.     The City publicized the intended commencement of this action in the manner required by Section 4(a)(4) of the Act prior to its being filed.

35.     The Attorney General has determined that it is appropriate to consent to a declaratory judgment allowing bailout by the City, pursuant to Section 4(a)(9) of the Voting Rights Act.  The Attorney General's consent in this action is based upon its own independent factual investigation of the City's fulfillment of all of the bailout criteria, and consideration of all of the circumstances of this case, including the views of minority citizens in the City and surrounding areas, and the absence of racial discrimination in the electoral process within the City.  This consent is premised on an understanding that Congress intended Section 4(a)(9) to permit bailout in those cases where the Attorney General is satisfied that the statutory objectives of encouraging Section 5 compliance, and preventing the use of racially discriminatory voting practices, would not be compromised by such consent.

<u>AGREED FINDINGS ON STATUTORY BAILOUT CRITERIA</u>

36.     The City is a covered jurisdiction subject to the special provisions of the Voting

Rights Act, including Section 5 of the Act, 42 U.S.C. § 1973c.  Under Section 5 of the Act, the

City is required to obtain preclearance from either this Court or from the Attorney General for

any change in voting standards, practices, and procedures adopted or implemented since the

Act's coverage date.  The only entity seeking bailout through this action is the City.  Neither

Jefferson County nor any of its other political subdivisions, other than the City of Pinson, is

seeking bailout.  The City is a political subdivision entitled to seek bailout from this Court for

itself and by itself under Section 4(a).  *Northwest Austin Municipal Utility Dist. No. One v.*

*Holder*, 129 S. Ct. 2504, 2516 (2009) ("We therefore hold that all political subdivisions . . . are

eligible to file a bailout suit").  There are no other governmental subdivisions within the City's

territory for which it is responsible or which must request bailout at the same time as the City,

within the meaning of Section 4(a), 42 U.S.C. § 1973b(a).

37.     During the ten years preceding the filing of this action and during the pendency of

this action, there has been no test or device as defined in Section 4(c) of the Voting Rights Act

used within the territory of Pinson (meaning the land comprising the City before and after its

incorporation) for the purpose or with the effect of denying or abridging the right to vote on

account of race or color.  During the relevant time period, there is also no indication that any

person in Pinson has been denied the right to vote on account of race or color.  42 U.S.C. §

1973b(a)(1)(A).

38.     During the ten years preceding the filing of this action, and during the pendency

of this action, no final judgment of any court of the United States has determined that denials or

abridgments of the right to vote on account of race or color have occurred anywhere within the

territory of Pinson (meaning the land comprising the City before and after its incorporation). Further, no consent decree, settlement, or agreement has been entered into resulting in any abandonment of a voting practice challenged on such grounds.  No action is presently pending alleging such denials or abridgements of the right to vote.  42 U.S.C. § 1973b(a)(1)(B).

39.     During the ten years preceding the filing of this action, and during the pendency of this action, no Federal examiners or observers have been assigned to Pinson or to Jefferson County.  42 U.S.C. § 1973b(a)(1)(C).

40.     During the ten years preceding this action, and during the pendency of this action, Pinson has submitted a number of voting changes to the Attorney General for review under Section 5.  The Attorney General did not object to any of these voting changes.  The City inadvertently failed to submit three 2008 unpopulated annexations to the Attorney General for review under Section 5 prior to implementation.  There is no evidence that the City failed to submit these matters prior to implementation for any improper reason.   Nor is there any evidence that implementation of such changes, which have now been precleared under Section 5, has had any discriminatory effect on voting that would contravene Congress' intent in providing the bailout option to a jurisdiction such as this.  During the ten years preceding the filing of this action, and during the pendency of this action, there has been no need for the City to repeal any voting changes to which the Attorney General has objected, or to which this Court has denied a declaratory judgment, since no such objections or denials have occurred.  42 U.S.C. § 1973b(a)(1)(D).

41.     During the ten years preceding this action, and during the pendency of this action, the Attorney General has not interposed any objection to voting changes submitted by or on behalf of the City for administrative review under Section 5.  No such administrative

submissions by or on behalf of the City are presently pending before the Attorney General.  The City has never sought judicial preclearance from this Court under Section 5.  Thus, this Court has never denied Pinson a declaratory judgment under Section 5, nor are any such declaratory judgment actions now pending.  42 U.S.C. § 1973b(a)(1)(E).

42.     During the ten years preceding the filing of this action, and during the pendency of this action, there have been no methods of election which inhibit or dilute equal access to the electoral process employed in Pinson.  Jefferson County conducts the City's federal, state, and county elections.  The City conducts its own municipal elections.  During the relevant time period, there is no evidence that any elections in Pinson have employed voting procedures that inhibit or dilute equal access to the electoral process.  42 U.S.C. § 1973b(a)(1)(F)(i).

43.     During the ten years preceding the filing of this action, and during the pendency of this action, there is no evidence that anyone participating in elections in Pinson has been subject to intimidation or harassment in the course of exercising his or her rights protected under the Voting Rights Act.  42 U.S.C. § 1973b(a)(1)(F)(ii).

44.     The City and County have presented available information regarding rates of voter registration and participation over time, available information concerning disparities in participation, as well as available information concerning appointment of poll officials.  All voter registration for all elections and the conduct of all federal, state, and county elections in Pinson have been conducted solely by Jefferson County throughout the preceding ten years; Pinson conducts only municipal elections.  There is evidence of constructive efforts by Jefferson County to expand opportunities for convenient voter registration and voting by all persons of voting age in the County, in that the County provides citizens with voter registration opportunities at numerous locations throughout the County, provides opportunities for election day and absentee

16

balloting, and provides voting-related information to voters in a number of ways.  Over the last

ten years, in Pinson, voter registration levels for black voters have increased, although rates of

voter registration for black persons of voting age remain significantly below that of white

persons of voting age.   Likewise, there is evidence of constructive efforts by Jefferson County to

appoint minority persons as election officials in the County generally, although there have been

no minority poll officials in elections conducted in Pinson polling places.   The City agrees that it

can take additional constructive efforts to ensure full compliance with the Voting Rights Act

with regard to ensuring greater opportunities to register to vote and to participate in elections and

to recruit a diverse pool of election officials for elections in Pinson, as further described below.

See 42 U.S.C. § 1973b(a)(1)(F)(iii) & (a)(2).

45.     During the ten years preceding the filing of this action, and during the pendency

of this action, the City has not engaged in violations of any provision of the Constitution or laws

of the United States or any State or political subdivision with respect to discrimination in voting

on account of race or color.  42 U.S.C. § 1973b(a)(3).

46.     Pinson has provided public notice of its intent to seek a Section 4(a) declaratory

judgment.  The City published a notice of the bailout on January 19, 2012, January 20, 2012, and

on February 23, 2012.  The City has publicized a notice of the proposed settlement of this action,

simultaneously with the filing of the Joint Motion for Entry of Consent Judgment and Decree, as

required by Section 4(a)(4).  42 U.S.C. § 1973b(a)(4).

CONTINUING OUTREACH EFFORTS AND REPORTING

47.     Pinson has agreed to undertake certain additional constructive measures to ensure

full compliance with the Voting Rights Act as outlined below.  Similar measures have been

employed by agreement in previous consent decrees in bailout actions in this Court. *See, e.g.*, *City of Sandy Springs v. Holder*, No. 1:10-cv-01502 (D.D.C. Oct. 26, 2010).

48.     Pinson will form a citizens' advisory group that is representative of the City's diversity and that will include at least two members drawn from each racial/ethnic group that comprises at least ten percent of the City's total population under the most recently available ACS data or 2010 Census data.  The City will solicit comments from the advisory group regarding constructive measures that can be taken relating to increase opportunities for voter registration, to increase opportunities for recruitment of a diverse group of poll officials at polling sites for all future elections in Pinson, especially municipal elections, and to increase opportunities generally for political participation in elections conducted in Pinson.  The City will inform the public of the opportunity to serve on this advisory group by advertising in local media, on the website, and through means such as contacting leaders of community organizations.  Meetings of the advisory group will be open to the public and minutes shall be posted on the City's website.   The City will consult with Jefferson County on steps that can be taken to increase recruitment of a diverse group of poll officials at polling sites in Pinson for future county-run elections, and to publicize recruiting for poll worker positions for municipal elections.

49.     During the ten-year period during which this Court retains jurisdiction of this matter pursuant to 42 U.S.C. § 1973b(a)(5), the City will send a report to the United States within 90 days after any municipal election administered by the City that includes:

    a.   A description of steps taken to increase opportunities for recruitment and participation of a diverse group of poll officials as well as the total number of persons by race who served as election officials in the election;

    b.  A description of steps taken to increase opportunities for voter registration and

participation in elections.

The report shall be sent by to the following address and email address:

> Chief, Voting Section
> Civil Rights Division
> United States Department of Justice
> Room 7254 NWB
> 950 Pennsylvania Avenue, NW
> Washington, DC  20530
> voting.section@usdoj.gov

    50.    The City of Pinson shall advise the public of these additional measures through

local media, on its website, and through any other means likely to convey this information to

City residents.

    Accordingly, it is hereby ORDERED, ADJUDGED and DECREED:

    1.    The plaintiff City of Pinson is entitled to a declaratory judgment in accordance with

Section 4(a)(1) of the Voting Rights Act, 42 U.S.C. § 1973b(a)(1);

    2.    The parties' Joint Motion for Entry of Consent Judgment and Decree is GRANTED, and

the plaintiff City of Pinson is exempted from coverage pursuant to Section 4(b) of the Voting

Rights Act, 42 U.S.C. § 1973b(b), provided that Pinson be subject to the requirements of

Paragraphs 47-50 above, and provided that this Court shall retain jurisdiction over this matter for

a period of ten years pursuant to Section 4(a)(5), 42 U.S.C. § 1973b(a)(5).  This action shall be

closed and placed on this Court's inactive docket, subject to being reactivated upon application

by either the Attorney General or any aggrieved person in accordance with the procedures set

forth in Section 4(a)(5), 42 U.S.C. § 1973b(a)(5).

    3.    Each party shall bear its own costs.

Entered this 20th day of April , 2012.


_____
UNITED STATES CIRCUIT JUDGE


_____
UNITED STATES DISTRICT JUDGE


_____
UNITED STATES DISTRICT JUDGE

*Agreed and Consented To:*


<u>/s/  Frank C. Galloway, Jr.</u>
FRANK C. GALLOWAY, JR.
Hand Arendall LLC
1200 Park Place Tower
Birmingham, AL  35203
Telephone:  (205) 502-0102
fgalloway@handarendall.com

*Counsel for Plaintiff*
*City of Pinson, Alabama*

Dated:  March 15, 2012

*Agreed and Consented To:*


THOMAS E. PEREZ                                    RONALD C. MACHEN, JR.
Assistant Attorney General                         United States Attorney
Civil Rights Division                              District of Columbia


   */s/  Risa Berkower*
T. CHRISTIAN HERREN, JR.
RISA BERKOWER
risa.berkower@usdoj.gov
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
Room 7254 NWB
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
Telephone:  (800) 253-3931
Facsimile:   (202) 307-3961

*Counsel for Defendant*
*Eric H. Holder, Jr.*
*Attorney General of the United States*
*and Thomas E. Perez,*
*Assistant Attorney General*
*Civil Rights Division*

Dated:  March 15, 2012